ARDIS v. GRAND RAPIDS & INDIANA RAILWAY CO.

1. CONTRACTS—CONSTRUCTION—INTENT.

A contract must be construed so as to effectuate the intent of the parties when it was made, therefore it should be construed in the light of the circumstances existing at the time it was made.

2. SAME—CONSTRUED MOST STRONGLY AGAINST PARTY RESPONSIBLE FOR LANGUAGE USED.

A contract drawn by one of the parties is subject to the rule of construction that it is to be construed most strongly against the party who is responsible for the language used.

3. SAME—CONTRACT—INTENT.

A party to a contract will be held to that meaning which he knew the other party to the contract supposed the words to bear.

4. SAME—ACCOUNTING—CONSTRUCTION—ACCEPTANCE.
> In proceedings for an accounting under the . terms of a written contract whereby a lumber company advanced money to a railroad company for the construction of a spur track, which was to be returned to it from the earnings of such spur, *held*, that if there was any ambiguity in the contract it was made clear by a letter written to plaintiff by defendant's superintendent subsequent to the making of the contract accepting the construction placed upon it by plaintiff.

5. EQUITY—ACCOUNTING—JURISDICTION.
> The proceeding, being for an accounting, was properly brought in equity.

Appeal from Kent; Perkins, J. Submitted January 11, 1918. (Docket No. 42.) Decided March 27, 1918. Rehearing denied June 20, 1918.

Bill by Samuel B. Ardis against the Grand Rapids & Indiana Railway Company for an accounting. From a decree for plaintiff. defendant appeals. Affirmed.

*Butterfield & Keeney*, for plaintiff.
*James H. Campbell*, for defendant.

STONE, J. This case is before this court upon appeal by the defendant from the decree of the circuit court of the county of Kent, in chancery, in favor of the plaintiff for $4,000, and interest, being the full amount of his claim. The bill was filed for an accounting upon a contract between the copartnership, the Ardis Land & Lumber Company, and the defendant, and the case involves the construction of the written agreement of June 7, 1906, hereinafter set forth. The plaintiff has succeeded to all the rights of the copartnership lumber company.

In 1905, the Lake City branch of the defendant's railroad extended from its main line to Mynnings. The lumber company owned about 2,800 acres of land east of Mynnings. It had built a sawmill for the manufac-

ture of hardwood lumber at Ardis, a point about three miles east of Mynnings. The lumber company desired a railroad to be extended from Mynnings to its mill at Ardis. There was other timber situated still further east which would come out, most conveniently, over the same road.

It was doubtless considered for the mutual benefit of the parties to build the extension. Under these circumstances two contracts were made by the parties. The first contract bears date November 1, 1905, and was as follows:

"This agreement made and entered into this first day of November, A. D. 1905, between the Grand Rapids and Indiana Railway Company, called hereinafter the Railway Company, as first party, and the Ardis Land and Lumber Company, a copartnership composed of Samuel B. Ardis and William Keelean, called hereinafter the Lumber Company, as second party, witnesseth:

"Whereas, the second party is the owner of timbered lands located near the Widdicomb Spur of the Lake City branch of the Railway Company's railroad, and is desirous of having the Railway Company construct a spur of about three miles in length to permit of the transportation of the timber cut from such lands, and from other lands which may be subsequently acquired, and

"Whereas, the Railway Company has agreed to construct such spur upon the terms and conditions hereinafter set forth,

"Now, therefore, in consideration of the premises, it is hereby covenanted and agreed:

"1. That the said spur will be constructed substantially upon the line indicated upon the blue print hereto attached and made a part hereof; the right of way therefor fifty feet in width, and such additional width as may be needed for the slopes of cuts and fills, and for side tracks and terminal facilities, to be acquired and furnished by said Lumber Company to the Railway Company free from all costs and expense, and the Lumber Company hereby agrees to convey the same to the Railway Company in fee at such time as it

shall be requested to do so. The right of way and the track laid thereon, together with the appurtenances, shall be the property of the Railway Company, but the right of way shall revert to the Lumber Company, its successors or assigns, if at any time the Railway Company shall remove its track and cease to use the property for railroad purposes.

"2. The Lumber Company will grade the roadbed, making all necessary cuts and fills thereon, and place the same in condition to receive the ties, the same to be subject to the approval of the engineer of the Railway Company. The Lumber Company will also so furnish and distribute upon the roadbed in a manner satisfactory to the Railway Company, the ties which are to be of such description as shall be satisfactory to the Railway Company.

"3. The Railway Company will furnish the rails and other materials except the ties, and will construct and install the track upon the roadbed, putting in the necessary switches, and will maintain and keep the same in repair during the continuance of this agreement.

"The line of such spur as indicated upon the blue print hereto attached, may, if deemed necessary by the engineer of the Railway Company for engineering reasons, be deviated from in such manner as he shall deem requisite, and the right of way therefor shall be furnished in the manner and subject to the conditions herein set forth.

"4. The Railway Company may remove its track from the said roadbed, and discontinue the use of the same at its option after the expiration of five years from the date hereof, or at such prior time as the said Lumber Company shall have completed its lumbering operations in the neighborhood of such spur, or at such other time as the business of the said Lumber Company and such other business as can be done thereon, does not, in the judgment of the Railway Company's officers, warrant its further maintenance.

"5. The said Lumber Company, in consideration of the construction of such spur, agrees to furnish for out shipment over the said spur, and over the railroad of the Railway Company during a period of five years from the date of this instrument, not less than seven-

teen hundred (1700) cars of forest products. In case the Lumber Company shall not so furnish the specified number of cars for shipment, it shall pay to the Railway Company its damage resulting from such failure, which shall be limited to, and shall be the actual cost to the Railway Company of constructing the track, of maintaining and operating the same during the period when in operation, and the removing of material when abandoned, together with the depreciation in value upon the material furnished by it, and the interest on the amount invested therein by the Railway Company at the rate of five per cent (5%) per annum for the time invested, less the sum of four (4) dollars per loaded car for each car shipped over the spur.

"6. The Lumber Company agrees to comply with all laws with regard to fencing the right of way, and to provide and maintain suitable crossings, cattle guards and signs where required, and to save harmless the Railway Company from any damage or expense resulting from its failure so to do, or for deficiency therein. The Railway Company shall, however, have the right to furnish and maintain, or furnish or maintain such fences, cattle guards, crossings or signs at its option at the expense of the Lumber Company.

"7. The Railway Company may at its option, for the purpose of reaching business of any character located beyond the plant of the Lumber Company, extend the said spur and conduct over the same any business which may result from such extension. The said spur as originally constructed, or as subsequently extended, shall not be confined to carrying the business of the Lumber Company, but any loaded cars hauled for others than the Lumber Company shall be included in the total of seventeen hundred (1700) cars to be furnished by the Lumber Company as provided in the preceding paragraph numbered five.

"8. The Railway Company constructs this spur in order to secure the freight shipped by or to the Lumber Company in connection with its lumbering business, and in consideration thereof, the Lumber Company agrees during the said period of five years to transport by the Railway Company's lines the property received or sent away by the Lumber Company in the transportation of which the Railway Company's

lines can be used, and that all freight, the destination of which shall be over the lines operated by the Railway Company, shall, so far as the Lumber Company may be able to control the same, be so routed as to give the Railway Company the benefit of the longest possible haul over lines owned or operated by it.

"9. The Lumber Company assumes all risk of loss or injury by fire to its buildings or property situated upon, or adjacent to the said right of way.

"The Lumber Company assumes all risk of, and agrees to indemnify and save harmless the Railway Company against all loss or damage for injury by fire or in any other manner to persons or property whose presence near such railroad is caused by the business carried on by the Lumber Company, where such injury is not caused by the Railway Company's negligence.

"10. After the Lumber Company shall have ended its operations in connection with which the said spur track is to be built, and shall have fully performed all its agreements and obligations under this contract up to that time, it shall be discharged from all further obligations under this contract.

"11. The burden of removing snow and ice from the tracks covered by this agreement, shall rest wholly upon the Lumber Company, but the Railway Company shall assist in the same with its flangers or snow plows when necessary, provided that the same can be done without interference with work on its main line.

"12. The terms and conditions of this agreement shall extend to and be binding upon the successors, heirs and assigns of the parties hereto respectively.

"In witness whereof, the parties hereto have caused this agreement to be executed by the proper officers in duplicate, the day and year first above written.

　"THE GRAND RAPIDS & INDIANA RAILWAY CO.,
　　　　"By W. R. SHELBY, Vice President.
　"THE ARDIS LAND & LUMBER COMPANY,
　　　　"By SAMUEL B. ARDIS, WILLIAM KEELEAN."

The supplemental contract of June 7, 1906, was as follows:

"An agreement made the 7th day of June, A. D. 1906, between the Grand Rapids & Indiana Railway Company and the Ardis Land & Lumber Company, a

copartnership composed of Samuel B. Ardis and William Keelean, supplementary to an agreement between the parties above named, dated Nov. 1, 1905, relating to a spur track connecting with the Widdicomb spur of the Lake City Branch of the Railway Company's railroad.

"The said parties do now hereby agree as follows:

"The Lumber Company has secured the right of way and has graded and prepared the roadbed and has delivered the ties on the ground ready for use for said spur, all at the cost to the Lumber Company of $4,000. It is now agreed that until the said expense shall be fully repaid to the Lumber Company, the Railway Company shall collect from all shippers or consignees other than the Ardis Land & Lumber Co. in addition to all other charges upon all shipments received by the Railway Company or delivered to it upon the said spur to be built for the Ardis Land & Lumber Co., $3.00 per car on all shipments in and out excepting wood, and upon wood $1.00 per car, such added charges not to be absorbed by the Railway Company, but to be paid by that company to the Ardis Land & Lumber Co. until such payment shall amount to the sums of $4,000.

"THE GRAND RAPIDS & INDIANA RAILWAY CO.,
          "By W. R. SHELBY, Vice President.
"THE ARDIS LAND & LUMBER COMPANY,
          "By WILLIAM KEELEAN, SAMUEL B. ARDIS."

The answer states that both of said contracts were executed at the same time, and in June or July, 1906. We think that the evidence shows that the first contract was prepared and approved in November, 1905, but probably was signed later, and after some work had been done by the Lumber Company thereunder. We deem the exact date of execution of the first contract unimportant. It is undisputed that the two contracts were executed, and they should be read together, and their true intent and meaning determined. The supplemental contract was transmitted in a letter dated June 11, 1906, to the lumber company, written by J. W. Hunter, the superintendent of the defendant. That letter was as follows:

"GRAND RAPIDS, MICH., June 11, 1906.
"(In your reply refer to 8).
"ARDIS LAND & LUMBER CO.,
    "Lake City, Mich.
    "*Gentlemen:* I enclose draft of additional stipula-
tion, providing that until your company shall be re-
paid the sum of $4,000, the cost to it of the right of
way, roadbed and ties, the Railway Company shall
collect $3.00 per car on all shipments in or out, ex-
cepting wood, and $1.00 per car on wood from all ship-
pers other than your company, and pay the same to
you.
    "If satisfactory, will you kindly execute upon the
part of your company and return for execution by this
company.
                    "Yours truly,
                    "J. W. HUNTER, Superintendent."

Upon the hearing it was the claim of plaintiff that
he, and Mr. Keelean, his partner, executed the con-
tract of June 7, 1906, upon the understanding that
the lumber company would be entitled to $3 per car
on all shipments over the spur, excepting wood, and
$1 per car on wood shipped over the spur, until they
were reimbursed for their advances, to the extent of
$4,000. The lumber company procured the right of
way, graded the roadbed, furnished the ties and per-
formed the stipulations of the contract by them agreed
to be performed. In so doing it incurred an expense
exceeding $4,000 and approximating $6,300; of which
$4,000 had been spent as claimed by the plaintiff at
the time the contract of June 7th was agreed upon.

At the hearing it was the claim of the plaintiff that
the lumber company did more than under the con-
tract it agreed to do in this: It obtained a right of
way between Mynnings and Ardis 100 feet wide in-
stead of 50 feet, as required in the contract. The
deeds to the defendant from the landowners for rights
of way were deeds in fee and contained no clause, as
contemplated in the contract, to the effect that the

right of way should revert to the lumber company, its successors or assigns, if at any time the defendant should remove its track and cease to use the property for railroad purposes. Also in the various deeds of the right of way as procured by the lumber company for the defendant, there was inserted at the request of the defendant, a clause, in substance, to the effect that the defendant should not be required to carry passengers upon such railroad, except at its election, and under such conditions as it might think proper, and that the defendant, its successors or assigns, should not be required to run passenger trains on said railroad, and that all rights, statutory or otherwise, to have passengers carried on said railroad, or to have passenger trains run thereon, were expressly waived by the grantors in said respective deeds, for themselves, their heirs, etc.

The rights of way so procured for the defendant cost the lumber company approximately $1,300, and in addition, the lumber company deeded some of its own land, and had to buy one or more tracts to get the right of way.

The railroad track to Ardis was completed about September 1, 1906. About a year and a half later, the defendant extended its track to Michelson, a distance of 11½ miles from the end of the Ardis spur— this extension was one complete operation—and the superintendent testified that it was first suggested in 1907.

Upon the extension from Ardis to Michelson, stations were established at Minthorn, 30 rods east of Ardis, Cummer & Diggins camp, at Merritt, at Carr & Barrett's camp, at Reedsburg, and at Michelson. The schedule in evidence shows that considerable quantities of lumber and wood have been shipped from these stations over the Ardis extension. Said schedule does not include any shipments made from Min-

thorn, the point 30 rods east of Ardis, or any shipments after the year 1911. It appears from the testimony of defendant's rate clerk and auditor that the defendant has not charged $3 a car upon shipments other than wood to or from points on the extension east of Ardis, or a charge of $1 a car upon such shipments of wood. However, by the same testimony it is undisputed that the defendant obtained an amount approximately equivalent to $3 a car upon all such shipments. The method or manner by which this was done was as follows: The base rate for all shipments to central freight association territory was seven cents a hundred pounds from Mynnings, Ardis, Lake City, Cadillac, and all the adjacent territory. But, for shipments upon the 11-mile extension, between Ardis and Michelson, the rate of 7½ cents a hundred pounds was charged; the 7½ cent rate not applying to shipments at Ardis, or originating on the 3-mile Ardis spur, but solely to shipments on the extension east of Ardis. It also appeared that the average car of lumber weighs somewhat in excess of 60,000 pounds, and often as much as 80,000 pounds. Taking the average at 60,000 pounds, it appears that on lumber shipments originating on the Michelson extension, $3 a car was paid by the shipper, in addition to the rate charged to the plaintiff for shipments made at Ardis. By this means the defendant collected for itself approximately $3 a car, but such added charges were absorbed by the defendant, and were not paid to the lumber company, as the plaintiff claims they should have been. If these additional charges had been accounted for and paid to the lumber company, at the rate of $3 per car on all shipments except wood, and $1 per car on wood, they would, concededly, have been sufficient to repay to the lumber company the sum of $4,000. No part thereof has in fact been paid. The defendant has refused to pay these sums to plaintiff

on the ground that practically all of the shipments originated not *on* the Ardis spur, but *east* of it. The position of the defendant is well expressed in its answer, wherein it states:

"The agreement dated June 7, 1906, was the carrying out of the suggestion made by the complainant orally to Mr. Hunter on or about September 1, 1905, as above stated, that his company should be paid something for cars loaded by others on the proposed extension, and later agreed to by the defendant. The agreement was as stated in the contract dated June 7, 1906, and was so perfectly and fully understood by both parties. The agreement of June 7, 1906, correctly and fully expresses the agreement of the parties on the subject. The understanding, agreement and intent of the parties was that the $3.00 per car on shipments, except wood, and $1.00 per car on wood in addition to all other charges, should be collected by the defendant, only upon shipments originating upon the said extension—that is, upon cars loaded by others than the Ardis Land & Lumber Company on the extension, and within the limits of the same and shipped out therefrom, and on shipments delivered to others on said extension. The purpose of the complainant in asking for said agreement was not for the reimbursement of the Lumber Company for the expense to it of said extension, but to give the Lumber Company control of the timber on lands along and in the vicinity of said extension which could be manufactured at the mill, so far as the same could be done by imposing said additional charges of $3.00 and $1.00 per car upon all shipments originating and delivered to the defendant by others than the Ardis Land & Lumber Company on said extension. This defendant did collect said additional charges upon all shipments originating upon and delivered to the defendant upon said extension by others than the Ardis Land & Lumber Company since the said extension was built, and on all shipments delivered to others on said extension. The aggregate of said charges so collected was $117."

The position of the plaintiff is:

*First.* That under the true interpretation of the

contract of June 7, 1906, the lumber company is entitled to receive the stipulated sum per car, whether the shipment originated on the Ardis spur, or beyond it.

*Second.* If there were any ambiguity in ·the contract, it is made clear by Mr. Hunter's letter of June 11, 1906, with which the contract was transmitted.

*Third.* That if the contract leaves the matter in doubt, it is a mistake against which equity will relieve, in order to effectuate the true intent and meaning of the parties.

The learned chancellor who heard the testimony, in a written opinion, agreed with the first two contentions of plaintiff, finding it unnecessary to consider the third. He specifically found "that the railway company later, on all shipments 'in and out' of the Ardis spur actually did charge shippers one-half cent additional per hundred pounds on lumber, which, under the proofs, would average $3 per car, as the agreement provided."

It is elementary that a contract must be construed so as to effectuate the intent of the parties when it was made; and to ascertain the intent of the parties, a contract should be construed in the light of the circumstances existing at the time it was made. *Kunzie* v. *Nibbelink,* 199 Mich. 308.

It is urged by the plaintiff that this contract is to be read in the light of the circumstances attending its execution, and quotations are made from the following cases: *Ferris* v. *Wilcox,* 51 Mich. 105; *Uinta Tunnel, Mining & Trans. Co.* v. *Mining Co.,* 141 Fed. 563, 566; *Kauffman* v. *Raeder,* 108 Fed. 171, 175.

It is the claim of the plaintiff that under the true interpretation of the contract of June 7, 1906, the lumber company was entitled to receive the stipulated sum per car, whether the shipment originated on the Ardis spur, or beyond it. There are some conceded facts which are significant, and which should be borne in mind in considering the questions involved. At

Mynnings and Ardis upon both sides of the spur track the timber had been taken off, and it was what is known as "cutover land." The amount of money that would be realized from a charge on the shipments made by others than the lumber company, and originating on this spur, would be so small, that it is inconceivable that the lumber company would have thought it worth while to enter into a contract concerning it. This has been demonstrated by the result of $117. It is reasonable to suppose that the parties had something else in mind. A careful reading of the testimony, and the documentary evidence, shows how the contract came to be made.

After the commencement of the construction of the Ardis spur, and after considerable money had been expended by the lumber company, the plaintiff and his partner learned that other parties intended to start lumbering operations east of their lands. There was no way in which this timber belonging to others could be drawn to market except over the Ardis extension or spur, then being constructed. It should be borne in mind that the original contract in its 7th paragraph contains the following language:

"The Railway Company may at its option, for the purpose of reaching business of any character located beyond the plant of the Lumber Company, extend the said spur, and conduct over the same any business which may result from such extension. The said spur as originally constructed, or as subsequently extended, shall not be confined to carrying the business of the Lumber Company," etc.

It will be noted that there was no provision which in any way obligated other persons or parties so sharing the benefits of this spur to bear with plaintiff's firm the burden of its construction. Prior to June 7, 1906, it had become apparent that the railway company would, or at least might, be called upon to extend this spur to assist new enterprises, and that the own-

ers of additional mills would enjoy the use of the road constructed at the expense of the lumber company.

Under these circumstances, the plaintiff and his partner met Mr. Hunter, and the matter was discussed. We find no clear contradiction of the testimony of the plaintiff and Mr. Keelean upon this subject. They said to him that other lumbermen were buying timber beyond the easterly end of the Ardis spur as then projected. They named the lumbermen who were making such purchases of timber. They said that the timber which these men were buying would be drawn over the Ardis extension; that, under these circumstances, it was not fair that the lumber company should pay the expense of constructing the spur, and that others should get the benefit thereof; and that the cost of the spur ought to be refunded by the defendant to the lumber company. According to the testimony of the plaintiff and his partner, Mr. Hunter replied that the proposition was a fair one, and subsequently the contract of June 7, 1906, was drafted in order to carry this agreement into effect. We find no evidence of any talk between the parties that those sums would not be paid to the lumber company unless the freight originated on the Ardis extension. In fact the word "originated" does not appear in the contract. It was first used by Mr. Hunter in his letter of December 21, 1909. Both contracts were drawn by the defendant's officials and counsel. This being so, the rule is that they must be most strongly construed against the party who prepared them, and who is responsible for the language used. *Thomson Electric Welding Co.* v. *Fence Co.,* 190 Mich. 496.

In our opinion the contract is capable of the construction contended for by the plaintiff and is not ambiguous, and we agree with the chancellor in that regard. If it can be said that there is any ambiguity

in the contract of June 7th, it is made clear by Mr. Hunter's accompanying letter. In it he said:

"The Railway Company shall collect $3 per car, on all shipments in or out excepting wood, and $1 per car on wood, from all shippers other than your company, and pay the same to you."

Under such circumstances it has been held that a party will be held to that meaning which he knew the other party to the contract supposed the words to bear. *San Jacinto Oil Co.* v. *Power Co.*, 41 Tex. Civ. App. 293.

In *Tallcot* v. *Arnold*, 61 N. Y. 616, it was said:

"The promise must be interpreted in the sense in which the promisee knew or had reason to know that the promisor understood it."

Many other authorities might be cited to the same effect.

One cannot examine the record without being satisfied that on reading Mr. Hunter's letter, plaintiff and his partner understood that the contract meant just what the letter said it did. They were, we think, entitled to rest upon the interpretation placed upon the contract by the defendant's superintendent. *Snead & Co. Iron Works* v. *Trust Co.*, 225 Ill. 442.

In our opinion the suit was properly brought in equity for an accounting. *Warren* v. *Holbrook*, 95 Mich. 185, 189.

We think the chancellor reached the correct conclusion, and the decree below is affirmed, with costs to plaintiff.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, FELLOWS, and KUHN, JJ., concurred. BROOKE, J., did not sit.