## WHITMAN *v.* WHITMAN.

CONTRACTS — CANCELLATION OF INSTRUMENTS—DEEDS—SUPPORT—
SPECIFIC PERFORMANCE.

A written contract whereby a father deeded certain premises to his son, who was to conduct a saloon business thereon, pay existing incumbrances against the same, and then execute a life lease to the father, who was to have "a living out of the proceeds of such business without charge being made therefor," construed and *held*, that upon paying the incumbrance and executing the life lease the deed had become absolute, but that the father was entitled to specific performance of the agreement for his support, the amount thereof, in excess of the income from the property which had been turned over to him upon discontinuance of the business, being made a lien thereon.

Appeal from Saginaw; Kendrick, J. Submitted June 11, 1919. (Docket No. 4.) Decided October 6, 1919.

Bill by Peter Whitman against John D. Whitman and another to compel a reconveyance of certain property, and for an accounting. From a decree for plaintiff, defendants appeal. Modified, and remanded.

*E. L. Beach,* for plaintiff.
*Purcell & Travers,* for defendants.

STONE, J. The bill of complaint herein was filed to compel a reconveyance by the defendants to the plaintiff of certain real estate in the city of Saginaw, for an accounting, "and that plaintiff be granted such other, further and different relief in the premises as may be agreeable to equity and good conscience."

On relief of grantor in conveyance in consideration of agreement to support which is broken by grantee, see notes in 43 L. R. A. (N. S.) 916 and L. R. A. 1917D, 627.

207—Mich.—22.

The salient facts leading up to this litigation are as follows: Plaintiff is the father of John D. Whitman. Zepha Whitman is the wife of the latter. In May, 1904, plaintiff was the owner of a parcel of real estate, situated upon the easterly side of South Washington street in the city of Saginaw (which street runs north and south), described as lot 4, except the south 20 feet, in block 33, Hoyt's plat of said city. This property has 40 feet frontage and is 120 feet deep. At this time there was a three-story brick building upon the north 20 feet of the above 40 feet, and the south 20 feet thereof was vacant property, from which no rent was received. At this time plaintiff was conducting a saloon situated in the building on the north 20 feet of said 40 feet, as he had been for a number of years prior thereto. The upper portions of the building were occupied by plaintiff, at and subsequent to the date aforesaid, as living apartments for himself, and for rental purposes, there being a number of rooms over the saloon, which were let out by plaintiff to lodgers. In the spring of 1904, plaintiff instituted divorce proceedings against his second wife, not the mother of defendant John D. His son, the defendant, was at the time working for the Banner Brewing Co. of Saginaw, as a driver of a delivery wagon, and plaintiff was living alone in the saloon building. Some time prior to May 8, 1904, the plaintiff made a property settlement with his wife in the divorce proceedings, by which she was to receive $4,500, and his attorney, Mr. Kirby, $500, making a total of $5,000 in all. The plaintiff, in order to carry out this arrangement, borrowed from the Banner Brewing Co. upon his note, secured by his capital stock in said corporation, $1,000, which was turned over to his wife as a cash payment on the $4,500, and gave her a mortgage for $3,500, dated May 8, 1904. He also gave a mortgage to Mr. Kirby,

his attorney, dated May 6, 1904, to secure the payment to him of the $500 above mentioned; both mortgages being upon the property above referred to. This brings us to the transactions which are particularly involved in this case.

In May, 1904, defendant John D. Whitman left his employment with the Banner Brewing Co. and entered into an agreement with his father, whereby he was to take over the management of the saloon business, and from the proceeds pay off the mortgages heretofore referred to. Plaintiff was, at the same time, to convey said property to his said son, with certain conditions. While there existed a verbal understanding and arrangement between the parties at the very beginning of their relations with regard to these matters, the same were not reduced to writing and signed by the parties until August 10, 1904, being the date upon which plaintiff obtained a divorce from his wife. That contract was as follows.

"This agreement, made and entered into this 10th day of August, 1904, by and between Peter Whitman, party of the first part, and John D. Whitman, party of the second part, both of Saginaw, Michigan.

"Witnesseth as follows: Whereas said first party this day made, executed and delivered to second party a warranty deed of lot number four (4) except the south twenty feet in block number thirty-three (33) Hoyt's plat of the city of East Saginaw, now a part of the city of Saginaw, Michigan, according to the recorded plat thereof, and whereas there is now incumbrance against said property in the sum of $4,000.00 in the nature of real estate mortgages, $3,500.00 of the same running to Ellen Whitman and $500 of the same to J. B. Kirby.

"Now, therefore, it is hereby agreed by and between the parties hereto that said John D. Whitman shall assume the management of the saloon on said property and shall as fast as possible and as soon as money is received from the proceeds of said business apply the same upon the payment of said mortgage indebted-

ness until the same shall be fully paid and discharged and it is further mutually agreed by and between the parties hereto that when said mortgage indebtedness shall be fully paid and discharged that the deed this day executed by first party to second party shall become absolute and the said John D. Whitman shall at that time execute and deliver to said Peter Whitman a good and sufficient life lease of the premises hereinbefore described. It is further understood and agreed that said Peter Whitman, John D. Whitman and his family may reside upon said property and receive their living out of the proceeds of such business without charge being made therefor.

"It is further mutually agreed by and between the parties that said John D. Whitman hereby agrees to execute to said Peter Whitman at any time before said indebtedness hereinbefore referred to shall be fully paid, a reconveyance of said property upon payment to said John D. Whitman, the sum of $460.00 and interest at the rate of six per cent. per annum from May first, 1904, and the further sum of $56.00 for each and every month the said John D. Whitman shall work in and about said saloon from May 1st, 1904, and six per cent. interest per annum computed on said sums to become due said second party each and every month. It is agreed that the right to redeem said property by the payment of said several sums above mentioned is a personal right given said Peter Whitman and not assignable or transferable, and in the event of said Peter Whitman's death before the mortgaged indebtedness hereinbefore mentioned is fully paid then and in that event said John D. Whitman takes and holds absolute title to said premises.

"In witness whereof the said parties hereto have hereunto set their hands and seals the day and year first above written.

(Signed) "PETER WHITMAN,<br>"JOHN D. WHITMAN.

"In presence of
"L. G. DUFF,
"JULIUS B. KIRBY."

This contract was duly acknowledged and recorded in the office of the register of deeds.

A warranty deed of said premises, bearing the same date, was executed and delivered by the plaintiff to John D., duly witnessed, acknowledged and recorded.

The $460 referred to in the contract was the amount which defendant John D. personally advanced on the liquor license for the year beginning May 1, 1904, and the $56 per month refers to the monthly wages which John D. was receiving when he went with his father, all of which was to be returned to him, with interest at 6 per cent. per annum, provided the plaintiff elected to take back the property, "at any time before said indebtedness herein referred to shall be fully paid."

The mortgage given to Mr. Kirby was discharged of record February 10, 1905, and that given to Mrs. Whitman was discharged on January 31, 1908, defendant John D. having paid both mortgages from the proceeds of said business.

On February 17, 1908, defendant John D. and his wife, Zepha, executed and delivered the life lease provided for in the contract, of the premises, to said plaintiff for the expressed consideration of "one dollar and other valuable consideration," and the parties continued in the occupation of said premises, and the conduct of the saloon precisely as theretofore, until May 1, 1914, when the saloon business was abandoned and John D. and wife moved to a farm which he had purchased near Onaway. When John D. quit the saloon business and removed from the building, the whole thereof was turned over to the plaintiff, and the first floor, where the saloon had been, was rented by the plaintiff for $50 a month.

After the last mortgage was paid, there was built upon the south 20 feet of said premises, which had been vacant and unproductive, from the proceeds of the saloon business, and $700 borrowed money, a small brick building, costing substantially $4,200.

This building was erected with the consent of the plaintiff, he and the said defendant John D. talking the matter over, and reaching the conclusion that it was advisable to construct the building. Subsequently, and on September 24, 1913, this south 20 feet, being the property upon which the new building had been erected, was sold for the sum of $5,000, and plaintiff and defendant joined in the deed. And also upon the same date all of the parties entered into a written party-wall agreement, with the grantees in said deed. From the money received from the sale of this piece of property, $1,000 was paid to the plaintiff by John D. and the balance of $4,000 was retained by the latter. Defendants claim that these sums substantially represented, respectively, the value of the vacant lot of 20 feet, and the cost of the building which John D. had erected.

At the hearing plaintiff claimed that he should have received $1,500, instead of $1,000. According to the testimony of defendant John D. he, on July 18, 1911, paid upon his father's note for $1,000 given to the Banner Brewing Co. and secured by his stock the sum of $500. This he claimed was the $500 which was intended to apply upon the $700 borrowed from a sister of the plaintiff, and which was used in the erection of said building. But instead of being paid direct to plaintiff's sister, it was, by an understanding between her and the plaintiff, applied on the note of his father, as above stated. This, according to the testimony of John D., accounts for $1,500, leaving but $200 for the plaintiff to pay upon the $700 borrowed from his sister.

The plaintiff, who at the hearing was nearly 70 years old, remarried in April, 1915.

Plaintiff alleged in his bill of complaint that at the time of making the life lease the defendants agreed to live as they had before in the home of said plain-

tiff, and take care of him and furnish him with a good comfortable home, and upon these representations the said plaintiff, at the request and solicitation of the said John D. and upon his promise that he would always look after and provide said plaintiff with a home, did make and execute to him the said deed; that the accepting of said life lease, and the making of the said deed, were upon the express understanding —and the only consideration for the same was that the said defendants were to make a good comfortable home for said plaintiff, and were to provide for, and take care of, him during his lifetime.

There is some confusion in these allegations of the bill, as the undisputed evidence is that the deed was executed and delivered by plaintiff, on August 10, 1904, whereas the life lease was not made until February 17, 1908. Defendants by their answer denied that the agreement or arrangement was different from that set forth in the written contract of August 10, 1904, or that they, or either of them, ever agreed to take care of the plaintiff, and furnish him with a home, or that plaintiff's rights were other or different than are expressed in said agreement and life lease.

At the hearing there was a sharp conflict between the testimony of the plaintiff and the defendant John D. Referring to a claimed verbal agreement at the time the life lease was executed and delivered by defendants, plaintiff, referring to John D., testified:

"He was to provide for me and keep me the rest of my days, provided that I accepted the life lease."

This was specifically denied by the defendant John D., who claimed that plaintiff's rights were all expressed in the written agreement and life lease. Plaintiff admitted that his memory was somewhat defective, and he testified: "I can't remember as I used to do." Two witnesses testified to statements made by John D. to the effect that he had "a deed of the

place and that he was to give his father a life lease, and had to support him the rest of his days." This testimony was denied by said defendant.

Mr. Kirby, who drew all of the papers and was a friend of both father and son, testified at some length, having been called by the defendants. He testified in part on direct examination as follows:

"I think the life lease is a part of the transaction growing out of the first contract; I do not know of any other paper."

On cross-examination the following appeared:

"Q. Do you know at the time when they came there, whether Peter was reluctant to the signing of that first contract? Just to refresh your memory, wasn't it in reference to the wife, the woman this man John D. was living with?

"A. I have this recollection, during the time they were negotiating about these papers, John Whitman's wife—whether they were married at that time, I do not know—had an altercation with the old gentleman —she used some instrument—she threw some knife at him, or something like that, and I do know that during the negotiations, the old gentleman was very reluctant, he was fearful she would be taken into the home, and by reason of her attitude drive him from the home, and John said to him, 'Father, I'll protect you in respect to that,' and he had a serious conference about it, and it depressed me seriously; she had assaulted him with a knife or something (I might put it with an instrument), and he did not like to go through the performance, unless he was assured by John he would be protected.

"Q. Don't you remember that what you have stated, that that took place after the contract was prepared and signed, and they were working under that contract, and it was just prior to the time when that life lease was made?

"A. I remember that it occurred, and that the old gentleman was very reluctant to sign, and then John encouraged him, he said he would protect him, but when that took place, or just when it took place, I couldn't say.

"*By the Court: Q.* Whether it was before the life lease was drawn or the other papers, you don't recollect?

"*A.* No.   *   *   *

"*Q.* Do you remember that in any of the controversies that took place between them, after the contract was prepared, that John D. Whitman was to take care of Peter, and that he was to have a home there?

"*A.* I couldn't remember specifically, but I understand they did live under that contract there, after the contract was prepared, and the life lease.

"*Q.* Yes, and he provided for him up to the time he went to Onaway in the spring of 1914; and now to refresh your memory, as I understand it they had several different talks at your office?

"*A.* Yes, sir.   *   *   *

"*By the Court: Q.* What do you think he meant when he said he would take care of his father and seeing he did not want?

"*A.* Do you want my conclusion?

"*Q.* If you can cull them from the conversation.

"*A.* I felt this way, from the character of their talk, there was a sort of friendly relation between John and his father; and my understanding was that John meant that he would take care of his father, even though it cost him the association of his wife (I thought he intended to admit that, Judge). I never saw a parent and son more friendly, a son more considerate of his father than John; in reference to these matters, I think they trusted each other implicitly; I think even though she had to get out of the house. That was the serious question and the extent of the talk. I do not know what the fight consisted of, or whether his testimony has shown anything about the altercation (turning to plaintiff). Did John's wife strike at you with something?

"*Plaintiff: A.* Yes (showing), there's the scar right there."

On redirect-examination, he testified:

"*Q.* So far as you are concerned these papers that I have shown you represent the agreement between them?

"*A*. Represent the agreement, and what I put in as attorney at that time.

"*Q*. Then they represent the agreement between the parties so far as you knew their agreements to be at that time?

"*A*. You are asking for my present recollection of it now?

"*Q*. I am asking for your understanding of it at the time you drew the agreement.

"*A*. I think that the first contract calls for a life lease.

"*Q*. Yes.

"*A*. I made the life lease.

"*Q*. That was the understanding by you?

"*A*. They came in later and asked me to make that life lease; anything different from that I don't know.

"*By the Court: Q*. If the consideration in that agreement was one dollar and other considerations, do you know what the other considerations were?

"*A*. The general relationship, and the manner in which they have been living, and all things generally, convinced me that there was more than a general taking over the business, there was a continuous chain of circumstances, and my habit was to put in 'one dollar and other valuable considerations,' when the real value could not be obtained."

The defendant John D. Whitman testified at length, and when testifying relative to the erection of the new building, he testified:

"*Q*. Where did you get the means to do it with?

"*A*. Out of the saloon business. My father at that time secured his maintenance and support from me out of the saloon business.   *   *   *

"*Q*. Now, Mr. Whitman, during the time you conducted the saloon business on the ground floor, your father received a portion of a certain amount for his living?

"*A*. Yes, sir.

"*Q*. And then when you went away he had the use and occupation of the building itself?

"*A*. Everything.   *   *   *

"*Q*. Your contract provides among other things that it is understood and agreed that said Peter Whitman,

John D. Whitman, and his family, may reside upon said property, and receive their living out of the proceeds of such business, without charge being made. You understand that part of the contract, that you and your father, and your wife were to live there, and were to have your living out of the business without charge?

"*A.* Yes, sir.    *    *    *

"*Q.* How much money did you give your father out of the proceeds of the bar after 1908?

"*A.* I couldn't say how much.

"*Q.* It was as much as he wanted to take care of himself?

"*A.* Yes, and he had different moneys, he was to Detroit.

"*Q.* That money came out of the saloon business and you let him have it?

"*A.* Yes, just the same as before the life lease was made.

"*Q.* Do you claim that you and your father never talked over, that you were to provide for him the same as before?

"*A.* Nothing but what the life lease calls for.

"*Q.* Did you say anything—didn't you say 'father, I will take care of you and give you money just as before?'

"*A.* No, sir.

"*Q.* But you actually did?

"*A.* Yes.    *    *    *

"*Q.* And while he was down the river in this boat house, where did he get his support and maintenance?.

"*A.* Out of the profits of the saloon."

The learned circuit judge who heard the case at the circuit found that the defendant John D. was under contract obligation to properly support the plaintiff during his lifetime; that when said defendant quit the business and went away in the spring of 1914 he violated his contract; that in the sale of the new building said defendant had received sufficient compensation for his services, and decreed that he should reconvey the remaining part of the property, to wit:

the north 20 feet of said lot, to the plaintiff. The defendants have appealed from this decree.

A careful reading of this record leads us to the conclusion that from the time of the making of the contract on August 10; 1904, it was the intention of the parties that the plaintiff should receive his "living," or support out of the proceeds of the business. In fact such was the express language of the agreement. That was a continuing right of the plaintiff, and was not done away with by the making of the life lease. In other words, as testified to by Mr. Kirby, "the life lease is a part of the transaction growing out of the first contract." No doubt, when the contract was made, it was contemplated that the business would be carried on indefinitely. It was carried on for a period of 10 years, and the conduct of the parties was the same during all that period, both before and after the making of the life lease. The practical construction of the contract by the parties is significant. It seems to be the claim of the defendants that the contract was merged in the life lease. We do not so understand it. The terms of the contract are still in force. The value of the property deeded to defendant John D. was probably $10,000. His duties are, we think, set forth in that contract, as well as his rights. The contract is to be read in the light of the circumstances attending its execution. It should be construed so as to effectuate the intent of the parties when it was made. *Kunzie* v. *Nibbelink*, 199 Mich. 308; *Ardis* v. *Railway Co.*, 200 Mich. 400, 411.

At the time of entering into this contract the plaintiff was a man well advanced in years. He had just incurred a heavy indebtedness and had mortgaged his property. He induced his son, John D., to undertake the management of the business and to pay off the indebtedness, and give him "a living out of the proceeds of such business, without charge being made

therefor." Upon the paying off of such indebtedness the deed which he that day executed and delivered to his son should become absolute, but the duty to furnish "the living" continued. From the evidence it is clear that the plaintiff was not to become a member of John D.'s family and eat at his table, but the living was to be provided. The evidence shows that such was the understanding of the parties, and such was the uniform course of dealing down to the spring of 1914, when John D. discontinued the business and moved away, leaving the plaintiff in the possession of the building under the life lease, chargeable with the taxes, insurance, and expense of repairs. We think the evidence shows that the net income from such building has not been sufficient to furnish a living to the plaintiff. It does not meet the question to say that it is the duty of a life tenant to pay such charges. The duty to support remains, under the contract. We cannot follow the opinion and decree of the court below in directing a reconveyance of the premises to the plaintiff. By the terms of the agreement and the paying off of the mortgages, the deed to defendant John D. became absolute, and he was under no obligation to reconvey after he had paid off such incumbrances. Under the evidence we find no fraud in the case. The representations of said defendant were promissory in their character, and the agreement can be specifically performed. The value or cost of the support of the plaintiff, over and above the net income of the property, can be readily determined, as well as that for future support, the same to constitute a lien on the premises. The defendant John D. did not violate the contract in deeding away the south 20 feet of the property, but his duty to support and maintain his father during his life remained. The decree below will be modified in accordance with this opinion; the case will be remanded to the court

below to take an accounting and to determine the amount due plaintiff for his support and maintenance since May 1, 1914, over and above the net income from said premises, and the same will be ordered paid to plaintiff, as well as the amount due annually from time to time for his future support and maintenance, upon the same basis; all of which will be a lien on the premises, to wit, the north 20 feet of said lot. No costs will be awarded to either party in either court, except that each party shall bear one-half the expense of printing the record.

Decree modified.

BIRD, C. J., and MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.

The late Justice OSTRANDER took no part in this decision.