## OLIVER *v.* BALDWIN.

1. Equity—Appeal 'and Error—De Novo.

While due weight should be given to the advantage which the circuit judge had in seeing and hearing the witnesses give their testimony in open court, this fact does not relieve the appellate court, in a chancery appeal, where the case is heard *de novo*, from the duty of weighing the evidence, and exercising its own independent judgment, in passing upon the evidence in the case.

2. Contracts—Cancellation of Instruments—Fraud—Evidence —Sufficiency.

On a bill to rescind, on the ground of fraud, a contract whereby plaintiffs transferred to defendants a majority of the common stock of a manufacturing concern, in consideration ·of defendants devoting their time and attention to said concern and placing it upon a sound and safe financial basis, evidence examined, and *held*, insufficient to sustain the burden of proof resting upon plaintiffs.

3. Same—Construction—Intent.

A contract must be construed so as to effectuate the intent of the parties when it was made, therefore it should be construed in the light of the circumstances existing at the time it was made.

4. Same—Performance—Rescission—Equity.

That defendants might have sold their stock without performing their undertaking of placing said manufacturing concern on a safe financial basis, is not sufficient ground for the rescission of the contract whereby said stock was so transferred, after defendants have performed, and plaintiffs have received the benefit of their efforts.

5. Same.

If it be conceded that defendants agreed to indorse notes at the bank, their failure to do so would not be ground for rescission, where the substance of the undertaking, which was to place the company upon a safe and sound financial basis, was accomplished, and the plaintiffs were not' injured.

6. SAME—EQUITY — EXECUTED CONTRACTS — CANCELLATION OF IN-
STRUMENTS—FRAUD.

Canceling an executed contract is an exertion of the most
extraordinary power of a court of equity, and ought not
to be exercised except in a clear case, and never for an
alleged fraud unless the fraud be made clearly to appear;
never for alleged false representations unless their falsity
is certainly proved, and unless the plaintiff has been de-
ceived and injured by them.

Appeal from Kent; Brown, J. Submitted January
15, 1918. (Docket No. 93.) Decided June 3, 1918.
Rehearing denied October 7, 1918.

Bill by Joseph W. Oliver and another against Frank
A. Baldwin and others for an accounting. From a de-
cree for plaintiffs, defendants appeal. Reversed, and
bill dismissed.

*Charles E. Ward,* for plaintiffs.

*Wilson & Johnson* and *Willard F. Keeney,* for de-
fendants.

STONE, J. The bill of complaint herein was filed
August 14, 1916, to obtain a decree requiring the de-
fendants Frank A. Baldwin, Victor M. Tuthill, and
Melvin D. Baldwin to return to the plaintiffs certain
shares of the capital stock of the Oliver Machinery
Company, hereinafter called the Oliver Company,
which had been assigned to said defendants by the
plaintiffs. The bill seeks to rescind for fraud and mis-
representation the transfer of the shares of stock
made on September 3, 1912, above referred to. The
alleged fraud and misrepresentation upon which plain-
tiffs rely as to the foundation of their right to rescind
the contract, is that defendants Frank A. Baldwin
and Victor M. Tuthill agreed to indorse $92,000 of
notes of the said Oliver Company held by the Grand
Rapids National City Bank, hereinafter called the

bank. It is also claimed that the shares of stock were transferred at a time when the plaintiffs were in great financial distress, and that the defendants, who took over the stock, were fully aware of this fact, and obtained the stock through a bargain which was unconscionable. The bill also seeks an accounting by the defendants composing the firm of Baldwin, Tuthill & Bolton of the assets of the Oliver Company; that they be ordered and decreed to pay any amounts which may be found due to the Oliver Company in respect to dealings between that company and Baldwin, Tuthill & Bolton, and that plaintiff Joseph W. Oliver be paid certain items of salary, and back salary to which it is alleged he is entitled.

It is the claim of the bill that when the stock was transferred to the defendants Frank A. Baldwin, Victor M. Tuthill (Melvin D. Baldwin also getting 32 shares), they, together with Ralph Baldwin, another son of Frank A. Baldwin, assumed and exercised absolute control of the affairs of the corporation; that said Frank A. Baldwin, Melvin D. Baldwin, and Victor M. Tuthill have violated their trust as directors of the Oliver Company, acting really in their own interest, instead of the interest of the Oliver Company, and have so manipulated the affairs of the company as to appropriate a large amount of property and money belonging to the Oliver Company, and refused to take steps in the name of the company to compel restitution. The Oliver Company was originally a plaintiff herein. The individual defendants made a motion in which they objected to the Oliver Company being joined as a plaintiff, and the result was, said company was made a defendant by order of the court.

As Frank A. Baldwin and Victor M. Tuthill are claimed in this case to be the chief offenders, we will refer to them as Baldwin and Tuthill. It is the claim of the bill, and not denied, that prior to September 3,

1912, plaintiff Joseph W. Oliver had been the maker of the business and assets of the Oliver Company. He was the owner of more than four-fifths of the common stock, but had transferred to his wife, Laura M., a part of his holdings.

The situation disclosed in this record grew out of the financial condition of the company, and its bank relations existing in 1912 and for some time before that year. The chief elements contributing to the present controversy were bank indebtedness of about $92,000 aforesaid, fear on the part of Mr. Oliver that the creditor bank would start some disastrous proceeding, confidence in his neighbors Baldwin and Tuthill, a belief that they might help him in his difficulties, and as plaintiffs claim a selfish desire on the part of Baldwin and Tuthill to take advantage of his confidence and trouble for the purpose of over-reaching and defrauding him. Mr. Oliver's experience in the machinery business extends over a period of more than 35 years. After learning the machinist's trade he became a salesman for a machinery company, a business which he followed for some 20 years. He then began to manufacture wood working machines, having the work done on contract. In 1892, having entered into a large contract for the manufacture of machines, and the market, owing to a panic having become bad, he personally took his machines to England, and there successfully marketed them. This led to the establishment of what is spoken of in this record as the Manchester branch, which was at first a branch office, and later an incorporated company, 25 per cent. of the stock of which was owned by Mr. Oliver, and which company was an auxiliary to the Grand Rapids business. This stock he had transferred to the Oliver Company.

At the time of the hearing, Mr. Oliver had been manufacturing his own machines for about 15 years.

He began in rented buildings, but finally went to Manistee and bought several disused sawmills and salt blocks, took the timbers and materials from these buildings, and erected a factory for himself, the one now in use by the company. He testified that constructing the building in this way it cost about $38,000, and that that was about one-half what it would have cost had he bought the material in the usual way, and that the building was as good as though built of new material.

It is claimed that in 1912 the Oliver Company had firmly established a reputation for building first-class machinery, and that its machines were sold for use in the engineering pattern shops of industrial plants, railroads and the like. Special attention was given to the making of machinery for pattern shops. The railroad companies, and such concerns as the Carnegie Steel Company, the Crane Company of Chicago, and other large industrial works were the purchasers of these machines; that the name of the company was thoroughly established, and in connection with its business the reputation was a valuable asset. It is the claim of plaintiffs that at the time of the transfer of the stock in question the machinery of the company was worth about $100,000; that there was a well equipped factory.

It is claimed that the company also had a large amount of material on hand, also patterns, drawings and patents of great value in connection with its business; that it owned 1,500 shares (25%) of the capital stock of the Oliver Machinery Company, Limited, of Manchester, England,—a very prosperous company; that this stock was valued at $7,250 on the books of the company, and always paid 15%, besides paying a stock dividend and reserving a surplus; and that the said Oliver Company was actually engaged in business and had more than $80,000 worth of raw, and partly

or wholly finished merchandise, besides bills and accounts receivable, and other valuable assets, but owing to the depressed condition of the machinery market it was unable to reduce at that time the indebtedness owing to the Grand Rapids National Bank.

The business of the Oliver Company was incorporated in 1906. Mr. Oliver was then practically the sole owner of the company and its assets. Very little of the common stock was ever sold. A comparatively small amount was turned over to employees, with a view of obtaining their co-operation. Its capital stock consisted of $150,000, of which $50,000 was preferred, and $100,000 common stock. The common stock was paid in in property. In 1907 the authorized common stock was increased to $600,000, of which $404,000 was issued, practically, for the same property the company had at its incorporation, with the additions made within the space of about one year which had elapsed since that time. Of the preferred stock $37,000 was issued. At the time the factory was built Mr. Oliver, as president of the company, obtained a line of credit with the Grand Rapids National Bank of $50,000. This bank afterwards consolidated with the National City Bank and is spoken of in the record by its present name, the Grand Rapids National City Bank. It took over the said loan. It is alleged that the $50,000 were used in fitting up the factory, and that the line of credit had been increased from time to time, so that in 1912 the debt of the company for borrowed money amounted to about $92,000. Fifteen thousand dollars of this amount, secured by a mortgage on Mr. Oliver's home, was to the City Trust & Savings Bank, a subsidiary bank having the same officials and stockholders as the Grand Rapids National City Bank. It appears both by the testimony of Mr. Oliver, and that of Charles H. Bender, an officer of the bank, that early in 1911 Mr. Oliver went to the

bank to obtain additional money. He there met Mr. Waters, the chairman of the executive committee of the bank. Mr. Bender, a witness for the defendants, testified that he was called into the room and took part in the conversation:

"Oliver asked for more money, and Waters asked him something about the condition of the business. Oliver turned to him rather sharply and said he did not come to him for advice, but came for assistance. Mr. Waters said that he might get both, and the conversation terminated rather abruptly, Mr. Oliver going out."

It appears that from that time on, Mr. Bender began going to the plant and talking with Mr. Oliver about the condition of the business; and that they went into some detail as to the items which composed the assets of the company, the witness saying:

"I think I was going into the books at that time and getting from the trial balances during the year, such light as they afforded on the condition of the business, and what I was primarily interested in was to test the best I could the value of the assets. * * *

"I learned from Mr. Oliver that the real estate was being carried on the books at a price in excess of its cost. I do not remember how much that excess was, speaking now of the time of these conversations. I do not remember what the figure was, but in the course of our investigation Oliver told something about how that plant was constructed and what its cost was and it developed that it was a less figure considerable than the figure it was carried on the books. * * *

"He gave me answers to such things as I inquired about. I undertook to find out whether the company was making money. * * *

"I should say that I was investigating the affairs of the Oliver Company for a couple of months before the audit was made by Ernst & Ernst in July, 1911. I conducted that investigation through repeated conversations with Oliver and those that he would call in for the purpose of testing the value of the assets of the company. During that period I had interviews with

Oliver at the bank and at the plant. I think more at the plant than at the bank. John Duffy was called into these earlier conferences. He was somewhat interested directly in the Oliver Company, and was also an old friend of Mr. Oliver and had had considerable manufacturing experience, and he, Oliver and I had some conferences at the plant. These principal assets were talked about, like the real estate, equipment, the inventory of finished and unfinished goods, how much of the inventory was raw material, how much was finished product, the general condition of the accounts receivable, and as there were considerable open accounts payable, their condition was somewhat discussed, bearing on the question of the then condition of the company, because of the first interview that the company was then in need of more money to prosecute its business. Mr. Oliver's request for more money was the way the thing started, so far as I was concerned, his coming to the bank, to which I referred."

(The testimony of Mr. Bender was very much circumscribed and limited by rulings of the court, under objection from plaintiffs' counsel.)

* * * "He (Oliver) said to me and I said to him that in our judgment the company was not making money at that time. The audit made by Ernst & Ernst came about from the discussions between Oliver and myself in relation to the condition of these assets, he having said to me that they were appreciated at the time the capital stock was raised in order to justify that increase in the capital stock, and he said that that was a matter that he did not know much about at the time, that he was acting on Spencer's advice, who had said to him that it would make a better showing for the company and look better to the bankers if the assets were increased and the capital stock raised as a result of that increase. And that led to our talking about the real value of these assets; and as I have already said, we then discussed in a number of conferences the value of the real estate, its cost, the equipment, which was one of the large items in the assets, and how that was arrived at, and the patent and 'good will' accounts, and the accounts receiv-

able and the bills receivable and the inventory; as a result of these discussions I suggested to Oliver that we ought to have an impartial audit made by a company who made that a business and he made no objection and was willing it should be done, and asked who I thought would be proper parties to make the audit, and I recommended Ernst & Ernst of Chicago, because they were certified public accountants, and at that time there were none in Michigan.   *   *   *

"I received a copy of this audit, Exhibit B, as soon as it was completed. Upon receiving it, and before that, I discussed with Mr. Oliver the various matters contained in it. I was in touch with Mr. Poindexter (representing Ernst & Ernst) and Mr. Oliver during the time the audit was going on. I think Poindexter was here two or three weeks. As the audit went on Poindexter told Oliver and me more or less about what he found and those matters were discussed between us. When the result of this audit was known, we discussed these various items, much along the lines we had before, and Poindexter arrived at a definite figure of the cost of the real estate which he said in our presence he had got from the books and from conversations with Mr. Oliver. Mr. Poindexter gave me the cost of the real estate as he had found it, and Oliver agreed that that was the fact; there was no dispute about what the real estate cost. The next item was the equipment, and Poindexter stated that his investigation showed that the equipment was its first cost, and that it had not been depreciated upon the books and represented the ledger item of the first cost of the equipment. There was some claim by Oliver at that time that there had been some depreciation on that, it was not any very large amount, but I think he claimed there was some depreciation. The question whether there was any obsolescence in that item was also discussed, and Poindexter simply made the statement that if there was any obsolescent items in the equipment account they did not appear to have been charged out of the account; and Oliver, as I remember it, claimed that the equipment was all alive and active and had been kept up. The question of the value of the inventory was discussed, and that had also been discussed between Oliver and me before Poindexter

came.  Poindexter stated the result of his investigation on that subject, that the cost had not been properly taken, and that it was an estimate, because it was worked down from an arbitrary basis of selling price rather than a built-up cost.  And Oliver claimed on that subject that they kept track of the labor as it was applied to these various articles they were manufacturing, and that while it was an estimate it was a fair estimate, and Poindexter discussed this matter because he instituted another method of inventorying merchandise which brought a value less than the value reached by the method that had theretofore been used. The inventory that was taken while Poindexter was there was taken on the basis he recommended.  Mr. Oliver claimed that the drawings and patterns were of considerable value to the business, and from our point of view I was not very greatly interested in the subject of the patterns because it was not a tangible asset, except to a going business.  I don't remember very much discussion about that item of $21,000 for patents, because I was not interested in that item.

"*Q.* The audit shows a loss by the company in its manufacturing of about $63,000, and the audit states that a portion of that loss might be accounted for by the difference in taking the inventory.  Did you learn anything about how much of the loss might be accounted for in that way?

"*A.* The only thing I recall about that is that it was discussed between us that this method that Poindexter recommended, and which was carried out, did bring a less result than the old method, and to the extent that if it did bring a less result it would be a part of the operating loss for the period under discussion.  I don't think in the discussion with Mr. Oliver any amount was talked of that this difference in taking the inventory might make, because at best that would have been nothing better than anybody's estimate.  *  *  *

"*Q.* It appears from the audit that the expense of selling had largely increased as compared with previous years.  Was that discussed?

"*A.* Yes, that was discussed, and as one of the elements that brought about this loss in doing business.

"*Q.* It appears that on September 1, 1911, a loan for $15,000 was made on a mortgage on Mr. and Mrs.

Oliver's home by the City Trust & Savings Bank. What was said between you and Oliver about that?

"*A*. Oliver said the company needed more money, that it had a large number of outstanding past due accounts payable, and that the credit of the company demanded that they be taken care of. I had him prepare a schedule of the past due indebtedness, how long it had been past due, and that was furnished, and as a result of that exhibit I said to him that the company certainly did need money to keep up its credit, but that the bank had gone as far as it could in furnishing money unsecured; that if he had any way of securing a further loan it would be considered. He said that he had no other property that he could put back of the loan except his home, that was in the name of himself and wife, and he would see whether Mrs. Oliver would be willing to put a mortgage upon it. He came back after a time and said that she was willing, and we made a mortgage of $15,000 on the home for the purpose of furnishing money which would go into the business as a loan to the business, and with that new money past due indebtedness would be paid. That loan was made, the money did go in there and a list of the checks made against the company was furnished. * * *

"*Q*. Did you have any inquiries on behalf of any of those creditors as to whether you were going to furnish money to pay up any of these accounts?

"*A*. I don't remember having any inquiries from any of the creditors or from any of the commercial agencies. After this audit was made and the loan of $15,000 was made with the City Trust & Savings Bank, I had frequent conversations with Oliver and with others connected with the business. I did not visit the plant very often after that time. Mr. Oliver and I talked from time to time about how the company was getting on. He came in very frequently to talk over a number of matters in connection with the affairs of the company. I don't remember as I said anything to him in regard to the progress I thought he was making in regard to the financial condition, except to give him as much encouragement as possible. A little later, some time in 1912, I reached a conclusion in my own mind as to whether he was making

financial headway. I stated to Mr. Oliver in a way, what I thought, but not just what conclusion I reached on that subject. I said to him all during the later part of 1911 and the early part of 1912, that the business had to have some readjustment, that they had go to show their ability to liquidate this inventory, to bring the business into better adjustment, or that some new money must go in there; that the bank felt insecure. I said that to him before the audit was made, and after it was made, and all during the year and the early part of 1912. I said it as much in the early part of 1912 as I did in 1911. I did not say it perhaps as emphatically at that time, because it had been said previously.  *   *   *

"I don't think I discussed with Mr. Oliver during the latter part of 1911 and the early part of 1912 whether he was making any progress in reducing his indebtedness. In response to my statement to him that the business would have to be reorganized, readjusted, or that there would have to be some new money put in, Mr. Oliver repeatedly said he would try to work to that end, and try to bring it around, bring about some situation that would satisfy us. Mr. Oliver came into the bank, I should say from memory, in July, 1912, it may have been the latter part of June, some time in the summer. He said he thought he was going to be able to make an arrangement that would satisfy us, that he was expecting to get some men interested in the business that he thought would prove satisfactory all around, and as I recall it, he did not voluntarily state who the parties were, and I asked him the question who they were, and he said that it was Baldwin and Tuthill, and wanted to know what we would think of them. He said that they had been long in that sort of business and understood it, and he was talking with them on the subject of their becoming interested in the business. I think I told him that I knew Tuthill slightly, just a social acquaintance, but I did not remember of ever meeting Baldwin. I knew who the men were, and had heard something of their career and that it had been successful, and that his having relations with those men looking to that end, was very interesting. That was about the extent of that first conversation. Time went

on and I heard nothing further from Oliver. So much time elapsed that I called him up and he said the matter was still under discussion. In the meantime I had made inquiries in regard to Baldwin and Tuthill and their business reputations. This matter was discussed between Mr. Wylie, Mr. Waters and myself and they investigated the matter as I did, each taking his own way. Mr. Wylie was president of the bank and Mr. Waters was the chairman of the board, and the three of us constituted the executive committee of the bank. When I called Mr. Oliver up he came in and said that the matter was still under discussion, and that he thought they were going to come to some agreement. I think we then asked him if I might talk with Baldwin and Tuthill, and I cannot locate that very accurately in my mind. But I know I did call for them, and it is my best memory that it was the result of Oliver's permission that I might talk with them on the subject. I don't think I told Oliver at the time the conclusion I had reached in regard to the desirability of his associating Baldwin and Tuthill with him. I can't just recall what was said by Mr. Oliver about my talking with Baldwin and Tuthill, but I do remember distinctly asking his permission to talk with them, and I perhaps may conclude that having asked his permission, if he had said no, I would not have asked them. They were asked to come in. My recollection is that I telephoned to Mr. Tuthill. At that time I had done no business with Baldwin or Tuthill, or either of them. They had never kept any account at our bank. As a result of my request they came in. I don't think the affairs of the Oliver Company were discussed at the first interview. The subject of discussion was whether they were seriously considering going in there. The Ernst & Ernst audit was referred to at that time, and was turned over to them. At that interview the question was not raised in any way about their endorsement of notes which the bank then had for the Oliver Company's indebtedness, if they went into the company. There was another interview a little later. My recollection is that at that time they came in on their own authority for the purpose of discussing somewhat the affairs of the Oliver Company and stating something of the conclusion that they had come to. *  *  *

"*Q.* Was anything said in any of the interviews with Oliver about Baldwin and Tuthill endorsing notes which the bank then held?

"*A.* No. I don't recall that it was ever referred to. * * *

"*Q.* Was anything said in the interview between you and Oliver in case Baldwin and Tuthill came into the business, who should be in control of it?

"*A.* Yes. When Oliver came in and said that they had practically agreed on the terms of their arrangement and were about to have a contract drawn by Mr. McPherson, I asked him at that time if a part of this arrangement was that Baldwin and Tuthill were to be in actual control and management of that business and company, and he said it was, that was a part of the arrangement that they had made, and that they were going to have it reduced to writing, and that he was going to transfer to them a majority of the stock in the company. I did not say anything to him on the subject of the attitude of the bank toward the Oliver Company, if Baldwin and Tuthill did come in and assume active control. I did not say anything to Oliver as to whether the bank would press its indebtedness. That matter was discussed at an interview with Baldwin and Tuthill. I do not recall having discussed it with Oliver at all. Baldwin and Tuthill never endorsed the notes for the indebtedness which the bank held at the time they went in.

"*Q.* Did they endorse the notes for such additional money as they got from the bank afterwards?

(This question was objected to on the ground that it was incompetent, and the objection was sustained by the court.) * * *

"*Q.* What, if anything, did the bank do, with reference to pressing for the payment of the Oliver Company indebtedness after Baldwin and Tuthill came in?

"*A.* Nothing. We did not press. We reduced the rate of interest on the indebtedness from 6 to 5% and that applied to the indebtedness secured by the $15,000 mortgage."

About this time Mr. Oliver met Mr. McPherson (a member of the law firm of Norris, McPherson & Harrington), who was at that time his personal attorney

in a litigation then pending in this court, and the substance of Mr. McPherson's testimony as to what took place, he having been examined as a witness for defendants, here follows:

"I drew the contract which has been introduced in evidence between Joseph W. Oliver, Frank A. Baldwin, and Victor M. Tuthill, dated September 3, 1912.

(So far as Mr. Oliver was concerned the matter of privilege, if any, was here waived.)

"In refreshing my recollection regarding the matter, I have turned back to the record that I made from day to day as I did work, as the basis for making charges, and after thinking the matter over, it is my recollection that Mr. Oliver saw me in the forenoon of August 27, 1912. I think he came to my office to tell me that he intended to make a change in the organization of his company by which he was to transfer a certain part of his stock, two-thirds, I think, to Baldwin and Tuthill to obtain their assistance in carrying on the business, and told me that it had been necessary to do it to satisfy the bank from which he was borrowing money. I do not recollect that that was any more than an informal conversation. I do not think we went into the details of what was to be done, but a few days later, on September 2, in the afternoon, Oliver, Baldwin and Tuthill came to my office and discussed the situation, and at that time Oliver stated substantially what he had before, that he intended to give Baldwin and Tuthill two-thirds of the stock of his company to pay them for the assistance they were to give him in working his business out, and he wanted to so reorganize the board of directors that they would be on it. I think it was necessary to increase the number of directors. At that time I asked them if their contract was in writing, and I do not know which one said it, it may have been Baldwin or it may have been Oliver, but I think it was Oliver, that they did not need any contract in writing, they were all neighbors and they understood what they were going to do. And I rather insisted that it was not right for Oliver to transfer two-thirds of the stock of the corporation without having something in writing to show what Baldwin and Tuthill

were to do as consideration for it. And I urged them as a matter of good business policy to put their agreement in writing. At that time, or on the day following, they came back to my office again. On the day following this contract was dictated, all three of them being present, and it was signed in my presence My impression is that it was not dictated until September 3, because in my record of September 3 I have a memorandum that I drew an agreement for Oliver, Baldwin and Tuthill. It was signed in my office. I do not think that any one of them stated all the terms of the agreement. All three sat with me around the table, and I asked them what the agreement was, and I rather insisted that Baldwin and Tuthill be more specific than they were as to what they were to do. You will notice this contract is rather vague as to how much time they are to give to the business, that is one thing, or as to when they could begin to draw anything from the business. They all said they were satisfied to have it in that shape, and it was their contract, not mine. That contract contains all that they stated to me to be a part of the agreement at the time. There was nothing said in my presence by Baldwin, Tuthill or Oliver to the effect that the contract did not embrace all of the agreements."

Cross-examination by Mr. Ward:

"Nothing was said to me by any of the parties as to how the debt at the Grand Rapids National City Bank was to be taken care of, unless it be the understanding that it had to be taken care of before Baldwin or Tuthill could draw anything from the business, but the details of how it was to be taken care of were not stated in my presence.

"*Q.* Then there was absolutely nothing said to you as to what Baldwin and Tuthill would do, if anything, in order that that indebtedness be carried along and that it would not embarrass the business?

"*A.* The manner in which it was to be carried along was in no way stated to me, and I do not think I ever knew. Baldwin did say they had arranged to reduce the interest from six to five per cent., but even how that had been done was not stated to me. Oliver, and

perhaps Baldwin, stated that they were neighbors, friends, and did not require a written contract.

"*Q.* And if I understood you correctly, it was you, with your lawyer instinct, who suggested and rather urged, that something be put in writing?

"*A.* Yes. I insisted as far as one could be justified in insisting, under those conditions, that there be something put in writing. It was unquestionably their intention to go ahead without a written contract. I think Baldwin joined with Mr. Oliver in expressing the idea that no written contract was necessary, that they were friends and neighbors.

"*Q.* I take it then that the memorandum you drew contained simply what you were able to elicit from them by the effort you have detailed?

"*A.* I have told you how I drew it. I understood they were stating to me the contract when I wrote that out.

"*Q.* You say you rather insisted that Baldwin and Tuthill be more explicit?

"*A.* Yes, the contract is even now vague in some particulars. What I sought to do was to so draw the contract that what they were going to do would be explicitly stated. There are some things which were not explicitly agreed upon, and for that reason they could not be explicitly stated. For instance, the time when they should begin to draw anything out of the business was dependent upon the time when it should become financially solvent, as to which different parties might draw a different opinion. And I recollect the contract was vague as to how much time they were to give to the business. But they insisted that they were to give to it only such time as they could, without taking their attention away from their other business. Mr. Baldwin stated there that Oliver should draw from the business his living, and the amount was not fixed. That was stated in connection with their agreement that they were to draw nothing, until the business was established financially.

"*Q.* Does your memorandum indicate what subject Oliver was at your office on, August 27th?

"*A.* Yes. The memorandum is as follows: 'A. M. (morning) advising J. W. Oliver about change of directors of Oliver Machinery Company.' It may be

that before that time I had met Oliver on the street and he had said something to me about it, and I suggested coming to my office. I occasionally met him, and whenever I did asked him how he was getting along, and if he had anything of that sort on his mind he would have spoken to me about it. I have no distinct recollection of that having happened."

The agreement of September 3, 1912, which was signed in Mr. McPherson's office, is as follows:

"Agreement, made this 3rd day of September, 1912, between Joseph W. Oliver, Frank A. Baldwin, and Victor M. Tuthill, all of Grand Rapids, Michigan.

"Whereas, said Joseph W. Oliver is the principal stockholder of the Oliver Machinery Company, a Michigan corporation, and Frank A. Baldwin and Victor M. Tuthill are men experienced in the business of manufacturing and selling machines, and said Joseph W. Oliver desires to obtain the assistance of said Frank A. Baldwin and Victor M. Tuthill in continuing and carrying on the business of the Oliver Machinery Company, and to obtain such assistance has agreed to assign and transfer to Frank A. Baldwin eleven hundred and six (1106) shares and to Victor M. Tuthill eleven hundred and six (1106) shares and to Melvin D. Baldwin thirty-two (32) shares of the common stock of the Oliver Machinery Company, being a majority of the common stock of said company.

"Therefore, in consideration of the premises and of the mutual promises of the parties hereto, Joseph W. Oliver has this day assigned and transferred to Frank A. Baldwin 1106 shares; to Victor M. Tuthill 1106 shares; and to Melvin D. Baldwin 32 shares of the common stock of said Oliver Machinery Company, and said Frank A. Baldwin and Victor M. Tuthill jointly and severally agree that through their ownership of a majority of the outstanding common stock of said company so transferred to them, they will assume control of the management of said Oliver Machinery Company and will give to the management of such business so much of their personal time and attention as they can devote to such business without neglecting their other business interests and that nei-

ther of them shall receive any compensation in the form of salary or otherwise for personal services, rendered to said Oliver Machinery Company until the credit of said company shall be firmly established and the affairs of said company shall be upon a sound and safe financial basis.

"Executed in triplicate.

"JOSEPH W. OLIVER,
"FRANK A. BALDWIN,
"VICTOR M. TUTHILL."

O. K. C. McP.

It is the claim of the plaintiffs that this written agreement did not contain all of the terms of the contract which was actually made; that it was agreed that Baldwin and Tuthill were to indorse the $92,-000 notes in the bank; that they not only agreed to do this, but that they stated to Oliver that the bank required such indorsement. This is emphatically denied by Baldwin and Tuthill, who insist that the whole agreement was reduced to writing, and that they never promised to indorse that paper, never represented that the bank required it, and that as a matter of fact the bank did not require such indorsement. All of the witnesses agree that Oliver approached Baldwin and Tuthill and urged them to become associated in his business, and undertake its management; also that Oliver told them that if they would comply with his request he would give them two-thirds of all the stock that Mrs. Oliver and he held in the Oliver Company. Oliver gives as his reason for his proposition, he "felt it was about the only thing to do at the time," and that he was "threatened with financial ruin," and was "too old to begin all over again." He further testified, on cross-examination:

"When I was trying to get Baldwin and Tuthill to assist the Oliver Company, I thought I was down and out mentally and financially."

It is the claim of plaintiffs, and it is the crucial point

in the plaintiff's case, that Baldwin and Tuthill agreed to indorse the notes representing the bank indebtedness of $92,000. This is strenuously denied by Baldwin and Tuthill, and there is an irreconcilable conflict in the testimony upon this subject. Baldwin and Tuthill upon the signing of the contract, and the assignment of the stock, took charge of the business of the Oliver Company. They concede that they did undertake with the bank to indorse for any additional moneys lent by the bank to the Oliver Company, under their management. Upon assuming control of the company they found it necessary to furnish more money immediately, and they accordingly lent the company $5,000, taking the company's note therefor. This note was renewed from time to time, and was finally paid in full. Baldwin and Tuthill also indorsed at the bank for all moneys required by the Oliver Company, in addition to the line of $92,000 existing when they assumed control of the company. One note so indorsed by them was for $10,000, and another for $4,000. The record shows 19 canceled notes so indorsed by Baldwin and Tuthill, the last note being canceled February 11, 1915. After Baldwin and Tuthill assumed the management of the Oliver Company, the notes at the bank were renewed from time to time.

The notes for the line of indebtedness existing when Baldwin and Tuthill acquired their stock continued to be indorsed by Oliver. The notes for the additional loans obtained at the bank were indorsed by Baldwin and Tuthill, and also by Oliver. It is the claim that Oliver supposed, until a short time before suit, that Baldwin and Tuthill indorsed all the notes, including the renewals of the line of credit existing when they came into the company. This is denied. Baldwin and Tuthill testify that they never agreed to indorse the notes owing to the bank, at the time of the acquisition

of their stock, and they urge that Oliver, who remained the president of the company, and was daily in the office, must necessarily have known throughout the three and one-half years next ensuing, that said defendants did not in fact indorse such notes.

It appears that when the audit was taken under date of July 19, 1911, the amount owing by the Oliver Company was $134,706.50. At that time the sum owing to the bank was $77,000, leaving $57,706.50 owing to others. We gather from the record that Baldwin and Tuthill believed that the assets of the Oliver Company were greatly over-valued, and the capital largely fictitious. They cut down the valuations of items which had been carried on the books at claimed excessive sums, and eliminated items which improperly, as they believed, had been carried on the books. On December 17, 1912, they caused a stockholders' meeting to be held, at which a resolution was passed by the stockholders reducing the common stock to $100,000 and authorizing new stock to the extent of 25 per cent. of the old. The resolution recited that the common stock capitalization, both authorized and issued, was greatly in excess of actual assets. Oliver voted for the resolution, as did all the other stockholders present. He also signed the certificate of decrease of capital stock filed with the secretary of State; and the tax assessments were reduced.

Complaint is made that after the stock was transferred and Baldwin and Tuthill came into the control of the business, Oliver's salary, as president, was reduced to $3,000 from $5,000. Said defendants claim that whatever was done in that regard was with the consent of Oliver, and was part of a plan to reduce overhead expenses, which were too large when compared with the volume of business done, and that salaries of employees were reduced. At the annual meeting in February, 1916, Oliver's salary was fixed

at $300 per month.   The salaries of the sons of Frank
A. Baldwin were also placed upon a monthly basis.

It is further claimed that at the time of the trans-
fer of the stock, the Oliver Company was indebted to
Oliver for salary accumulated and unpaid in the sum
of $6,343.36, and it is urged that Baldwin and Tuthill
improperly caused this item to be charged off the cor-
porate books.   It is claimed by said defendants that
Oliver agreed to this action.   It is asserted by plain-
tiffs that Baldwin and Tuthill concede that they paid
nothing, and gave nothing for the stock in question.
This is hardly a correct statement.   While they did not
pay in cash for the shares, it cannot be said that they
did nothing, or paid nothing therefor.   They lent
money to the company, indorsed its paper for all
moneys borrowed at the bank, in addition to the debt
existing when they assumed the management, induced
the bank to carry the indebtedness held by it against
the Oliver Company, and to cut the rate of interest on
all such indebtedness from six per cent to five per
cent., instituted many economies, furnished for three
years, without charge, the services of Melvin D. Bald-
win, a skilled man, as factory superintendent.   Oliver
testified:

"Melvin put in his time for nothing until January
1, 1916.

"Q. He acted as superintendent from January 1,
1913, to January, 1916, without compensation?

"A. He acted as general manager at times, and
everything else.   He drew no salary during that period
to my knowledge."

The said defendants also furnished the services of
Ralph F. Baldwin from April 1, 1913, to the close of
that year, without charge.   And it must be said in the
light of this record that Baldwin and Tuthill gave
sufficient of their time, skill, ability, and management
to said business to extricate the company from its

critical and precarious condition in 1912, in which they found it, and place it and its affairs upon a safe and sound financial basis.

Baldwin and Tuthill were able to continue friendly relations with Oliver until about March, 1916. Upon that subject Oliver testified:

"*Q.* Your relations with Baldwin and Tuthill and Melvin and Ralph were intimate and friendly until just before that March, 1916, meeting, were they not?

"*A.* Our intimacy ceased before that time. The friendliness extended to about that time."

By this time the business of the company had become exceedingly prosperous, all of the $92,000 notes held by the bank were paid, and it is claimed by the said defendants that Oliver began to regret that he was not the sole owner of the business, and he assumed an unfriendly attitude, not only toward Baldwin and Tuthill, but toward Melvin and Ralph. This culminated at a meeting of directors about March 23, 1916, in a demand by Oliver for his back salary which had been charged off the books, and in a claim by Oliver that the stock of the Oliver Machinery Company, Ltd., of Manchester, England, theretofore carried as an asset of the Oliver Company, belonged to his wife. These claims were refused, and there is no doubt that from this time on there was much friction between Oliver and said defendants, including Melvin and Ralph.

Much criticism is made of Baldwin and Tuthill in respect of the turret lathes. When Baldwin and Tuthill assumed control of the Oliver Company it was engaged solely in the manufacture of wood-working machines. It had never made either an engine lathe or a turret lathe, which are iron-working machines. After the outbreak of the European war, and about April, 1915, the company conceived the idea of securing contracts for making shells for the English,

French, and Italian governments. In anticipation of securing such contracts the company began the production of lathes, in order that it might be equipped to perform the anticipated contract. About 140 turret lathes and 25 engine lathes were required. This work proceeded. When it became apparent that the company would not secure a shell contract, it occurred to the management to develop a demand for lathes for the trade, as numerous plants in the United States and Canada had secured shell contracts, and required lathes in the manufacture thereof. At that time, it is claimed by said defendants, the facilities of the Oliver Company were so taxed that it was impossible for it to manufacture the lathes; that for this reason it was agreed that the turret lathes should be manufactured at the Baldwin, Tuthill & Bolton factory. Numerous other shops in Grand Rapids were employed to assist in the work. It is claimed that Oliver not only assented to the manufacture of the turret lathes by said firm, but that he recommended that some skilled workmen be transferred from the Oliver Company to the Baldwin, Tuthill & Bolton plant, in order to facilitate the work. These lathes were marked in the name of the Oliver Company, and the name "Oliver" was cast in the machine. Much complaint is made by plaintiffs as to the division of the profits growing out of this work, and there is much testimony in the record on the subject.

The trial court entered a decree for the plaintiffs, finding, among other things, that:

"The plaintiffs would not have transferred said stock, or any part of it, to said defendants if they had known that defendants had not, and did not intend to indorse the notes representing said bank debt. * * *

"The whole transaction, including the written contract, was therefore voidable at the instance of the plaintiffs. The plaintiffs did not discover the falsity of the statements and representations of defendants

Frank A. Baldwin and Victor M. Tuthill until in July or August, 1916, and shortly thereafter filed their bill in this case. They have never waived their right to rescind the transaction for the fraud so perpetrated upon them.

"Under the claim of the defendants Frank A. Baldwin and Victor M. Tuthill there was no consideration at the time of the transfer of the stock in question, and, in any view of the case, the consideration was grossly inadequate, and the defendants Frank A. Baldwin and Victor M. Tuthill obtained an unfair and unconscionable advantage over the plaintiffs by reason of their great financial embarrassment."

It was decreed that the defendant should deliver up their stock for cancellation; that the Oliver Company should pay to Joseph W. Oliver both the back or accumulated salary with interest, and also the unpaid salary at the rate of $5,000 per year, from November, 1912. Without ordering any accounting the decree simply takes from said defendants their stock without any compensation for their services whatever, stating that—

"They have devoted but little time to the management of the business. * * * Even if under these circumstances they could justly claim compensation for their time, their management of the affairs of the company, has been such, and the profits and advantages derived by them from their management, are such as to greatly over-balance anything done by them for the Oliver Company."

Costs were awarded to the plaintiffs. The defendants have appealed.

It is vigorously urged by counsel for plaintiffs that, the circuit judge having seen and heard the witnesses testify, his finding upon the facts should not be disturbed. While due weight should be given to the advantage which the circuit judge had in seeing and hearing the witnesses give their testimony in open court, this fact does not relieve this court, in a chan-

cery appeal, where the case is heard *de novo*, from the duty of weighing the evidence, and exercising its own independent judgment, in passing upon the evidence in the case. This case presents a large record, there being more than 1,100 pages of printed record and more than 400 pages of printed briefs and arguments, all of which have had our careful attention. Many collateral questions and matters have been covered by the testimony and arguments—many of which we have not alluded to, but all have been examined. We are unable to agree with the circuit judge in the conclusions which he reached. In our opinion the plaintiffs have not sustained the burden of proof resting upon them in the case. We think that the written contract should control in the case, and in our judgment the plaintiffs have had the full benefit of the contract. What was the real intent and purpose of the contract? Manifestly, it was to obtain the assistance of Baldwin and Tuthill in placing the business of the Oliver Company upon "a sound and safe financial basis." That has been accomplished, and the contract has been fully executed. Every detail of every act which was to be done by Baldwin and Tuthill in bringing about this result was not contained in the contract, neither does the law require it. As we have recently said:

"A contract must be construed so as to effectuate the intent of the parties, when it was made; and to ascertain the intent of the parties, a contract should be construed in the light of the circumstances existing at the time it was made." *Kunzie* v. *Nibbelink*, 199 Mich. 308; *Ardis* v. *Railway Co.*, 200 Mich. 400, 411.

In our opinion the contract was neither uncertain, unconscionable, nor without consideration. It does not meet the question to say that Baldwin and Tuthill might have sold their stock. They did not sell it, but have performed the contract, and have placed the Oli-

ver Company upon a good financial basis and plaintiffs have profited thereby.

If it were to be conceded that Baldwin and Tuthill agreed to indorse the notes at the bank, and had told Oliver that they were required by the bank to do so, their failure to do so would not be ground for rescission, because the substance of the undertaking was to place the company upon a safe and sound financial basis, and that has been accomplished, and the plaintiffs are not injured. In other words, the undertaking has been executed, and the object accomplished.

"Canceling an executed contract is an exertion of the most extraordinary power of a court of equity. The power ought not to be exercised except in a clear case, and never for an alleged fraud, unless the fraud be made clearly to appear; never for alleged false representations, unless their falsity is certainly proved, and unless the complainant has been *deceived and injured by them.*" *Atlantic Delaine Co.* v. *James,* 94 U. S. 207, 214.

In our opinion, neither upon the facts nor the law of this case are the plaintiffs entitled to relief. The decree will be reversed and the bill of complaint dismissed, but without prejudice to the right of Joseph W. Oliver to sue the Oliver Company in a court of law to recover the back salary alleged to have been charged off the company's books.

The defendants will recover their costs of both courts.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.