MAHDER *v.* SOULE.

MORTGAGES—PAYMENT—DISCHARGE.
  On a bill for the discharge of a mortgage, the finding of
  the court below that said mortgage was included in the
  amount of another mortgage which has been fully paid,
  and therefore plaintiff was entitled to the relief prayed,
  *held,* sustained by the record.

Appeal from Ottawa; Cross, J.  Submitted June 5,
1919.  (Docket No. 57.)  Decided July 17, 1919.

Bill by Anna L. Mahder against Fay F. Soule for
the discharge of a mortgage.  From a decree for plain-
tiff, defendant appeals.  Affirmed.

*Louis H. Osterhous,* for plaintiff.

*Charles E. Misner,* for defendant.

Plaintiff by her bill of complaint in this cause
sought to have a certain mortgage declared paid and
discharged of record.  Defendant has appealed from
a decree of the circuit court granting the relief prayed
for.  The circumstances disclosed by the evidence are
as follows.  On November 10, 1909, Charles E. Soule,
an attorney of Grand Haven, acting as agent for a
Mrs. Cummings, whose funds he had for investment,
loaned $275 of her money to one Dwight H. Cheese-
man, taking the promissory note of said Cheeseman
and wife, of which the following is a copy:

"$250.00          GRAND HAVEN, MICH., Nov. 10, 1909.
  "Within six years after date, we, or either of us,
promise to pay Fay F. Soule, trustee, or bearer, two
hundred seventy-five dollars at National Bank here,
in sums and at dates, viz.:  Nov. 10, 1910, $25 and
$50 per year for five years thereafter at said date,

with interest at 6% per year on all unpaid amounts, payable semi-annually, for value received.

"DWIGHT H. CHEESEMAN, and
"MARIA CHEESEMAN."

—and a collateral mortgage, executed by Cheeseman and wife to "Fay F. Soule as trustee for the holder of the promissory note hereinafter mentioned, and without other interest," covering lots 5, 6, 7, 8 and south half of lot 4, in block E, of the village of Robinson, Ottawa county; also the southeast quarter of the northeast quarter of section 13, town 7 north, range 15 west, in Robinson township in said county. Fay F. Soule is the son of Charles E. Soule. The purpose in making the note and mortgage run to a trustee was thus explained by Mr. Soule in his testimony:

"I made them in such shape that I could sell the mortgage and the note without any indorsement, without any assignment, and I could tell people now there won't anybody know that you hold that paper at all, your name isn't mentioned in there, it goes to my son as trustee, and there don't anybody know you hold it, and that is quite an object in making that kind of loan, and it transfers just exactly like a hundred dollar bill, by delivery."

The mortgage was a first lien on the village lots and a second lien on the 40-acre farm, on which latter the Grand Haven State Bank held the first mortgage. Following is a chronological history of the transactions affecting this note and mortgage and the lands which it covered:

1910

Sept. 15　Mr. Soule, as agent for both Mrs. Cummings and a Mrs. Duryea (whose funds he also had for investment) took over the note and mortgage for Mrs. Duryea, paying over from Mrs. Duryea's funds to Mrs. Cummings' funds the amount of principal and interest then due on the said note and mortgage.

This transfer was made without indorsement or assignment.

Oct. 7    Cheeseman and wife conveyed the village lots covered by the mortgage to William Foster, by warranty deed with full covenants, not excepting the mortgage.

Nov. 15   Foster paid the interest on the note and mortgage to Nov. 10th, also $25 on account of the principal, and deeded the village lots to Samuel Mahder.

Dec. 5    Cheeseman and wife conveyed the farm property to Frank Allen by warranty deed with full covenants, not excepting the mortgage.

Dec. 30   Allen paid in full the mortgage given to the Grand Haven State Bank which was the first lien on the farm property. (This mortgage had been taken over by Mr. Soule from the bank, in order to protect the second mortgage, and foreclosure proceedings had been instituted by him.) This payment left Mrs. Duryea's mortgage the first lien on the farm property as well as on the village lots.

1911

Mar. 13   Samuel Mahder conveyed the village lots to Anna Lascobar, who is the plaintiff herein, having afterwards, by marriage to said Samuel Mahder, become Anna Mahder.

Apr. 26   Anna Lascobar executed a new note and mortgage to Fay F. Soule, trustee, for $550, due three years after date, covering the village lots and other property.

It is the plaintiff's claim that this new note and mortgage were given in payment of the balance of the Cheeseman note and mortgage, $250, and that she received in addition $290 in cash, Mr. Soule charging $10 for his services; and that the old note and mortgage ought, therefore, to have been surrendered, canceled and discharged. What the real facts were in connection with this transaction of April 26, 1911, is the principal question in issue.

Plaintiff's version of the matter is thus stated by her counsel in his brief:

"Early in April, 1911, the plaintiff needed some money for the purpose of making repairs upon the house on the premises and applied to the Peoples Savings Bank, of which Charles E. Soule was a director and for which he was attorney, for an additional $300 loan on the lots and other lands. Later Mr. Soule and the cashier of the bank went out to the property and looked it over and advised Mrs. Mahder that the bank could not make the desired loan upon the premises, but that if she would come down to Grand Haven and see Mr. Soule, he might be able to arrange the loan for her. Mr. Soule gives as his reasons for advising the bank not to make the loan: *first,* under the law the bank could not take a second mortgage, and *second,* that the value of the property was not more than $750 or $800, and was not, therefore, sufficient security.

"Mrs. Mahder later went to Grand Haven and saw and talked with Mr. Soule, in the directors' room of the Peoples Savings Bank, and there, on April 26, 1911, she completed negotiations with him, executing and delivering at his request, payable to Fay F. Soule, as trustee, a promissory note for $550, due three years after date and secured by mortgage upon the village lots and other property.

"Mrs. Mahder claims that upon the execution and delivery of the $550 mortgage, Mr. Soule paid to her in currency the sum of $290, being the $300 loan she had been seeking, less a charge of $10 for examination of abstract and preparing the mortgage; that the $250 Cheeseman mortgage and the new $300 mortgage were merged in the new mortgage for $550; that the $250 mortgage was in that manner fully paid and satisfied and should have been discharged.

"Thereafter Mrs. Mahder regularly paid to Mr. Soule the interest upon the $550 mortgage; on April 25, 1914, she paid $170 upon the principal; and, on or about May 2, 1914, she paid the balance due upon the mortgage in full to Charles E. Soule, and the same was discharged May 18th.

"At no time after April 26, 1911, although for three years she was paying interest to him upon the $550 mortgage and eventually paid all of the principal, did Mr. Soule say anything to the plaintiff, nor did the plaintiff say anything to Mr. Soule, concerning the

$250 mortgage, and no claim was at any time made by Mr. Soule to her that the $250 mortgage had not been paid, and she was never asked for the payment of interest or any other sum on account thereof."

Defendant's version is thus set forth in his counsel's brief:

"Plaintiff called Mr. Soule into a room, away from the cashier and Dr. DeKleine, said she had to have the money and asked him if he would not get it. This is Mr. Soule's testimony, and, to this point, there is no conflict. Plaintiff testifies,—

"'She took Mr. Soule into another room and told him she had to have the money, and he asked her what she wanted to do with the money.'

"In this there is conflict:

"'She said Mr. Mahder was in trouble in Chicago and she had to have the money to help him out.'

"She says, in reply to his question:

"'Well, I want to fix my place up.'

"She denies she told him she wanted the money to help Mahder out of trouble; denies there was any trouble. She admits she eloped with him from Chicago, where he deserted his family there.

"Mahder testifies:

"'He was arrested in Chicago for living an adulterous life out here with Mrs. Lascobar, the plaintiff in this case.'

"Mr. Soule says he told her if she would come to Grand Haven after he could examine the title, he might help her out, and made an appointment for April 26th. She contradicts. Mahder says Mr. Soule would send a card and could see him at Peoples Savings Bank. She met him in bank directors' room, April 26th. He says no one else was present; she says that Mahder was there, her 'husband.' Mahder denies he was her husband, says:

"'At that time he was living on this property with Anna Lascobar, and he went down to the Peoples Savings Bank where they met Mr. Soule in the directors' room.'

"Mr. Soule had looked up the two titles without abstracts; Mrs. Lascobar wanted, 'had to have,' $400 to free Mahder from his troubles in Chicago by her eloping with him, deserting his family there. Mr. Soule makes it $400 positively from her wanting that amount from the bank, and his paying her $390 by his check, $10 less as part of commission, which she indorsed and put through the bank regularly, her indorsement admitted by her and Mahder.

"She 'had to have the money,' and agreed to make a note and mortgage for $550; $60 for Mr. Soule's commission, $100 for his legal opinion and effort to have the Allen farm pay the mortgage, and $390 she was to have in money; a note was made for $550, payable to Fay F. Soule, or bearer, secured by a mortgage quite identical with the Cheeseman mortgage, due three years after date with interest at 6 per cent., payable semi-annually, the mortgage to 'Fay F. Soule, as trustee for the holder of the promissory note hereinafter mentioned, and without other interest'; Mr. Soule drew the papers and she signed them and Mr. Dornbos, the cashier, and Mahder were called in for acknowledgment and witnesses; he gave her his check of Mrs. Edmonds' money he then had to loan for $390, which she indorsed and put through the bank regularly; he charged in his journal that day, Mrs. Shirley Edmonds to bills receivable, $550; bank, $390, fees $160. This is Mr. Soule's testimony. \* \* \*

"The testimony shows that plaintiff received the following check:

"'Grand Haven, Mich., April 26th, 1911. No. 2869.

"'The Peoples Savings Bank of Grand Haven: Pay to Anna Lascobar, or order, $390, Three hundred ninety dollars.

"'CHAS. E. SOULE.'

"Indorsed on back:

"'Anna Lascobar.'

"Bank's stamp on face:

"'Peoples Savings Bank of Grand Haven. Paid April 27th, 1911.'

"Plaintiff admitted that this was her name on there, and she wrote it there herself. \* \* \*

"The other item, which makes up the amount of the 'Lascobar mortgage,' $100, was by virtue of an agreement between Judge Soule and plaintiff. The Cheeseman mortgage covered two parcels of land, Robinson village lots and 40-acre farm. The former being sold first to plaintiff, and later the farm was sold to one Allen. Judge Soule informed plaintiff that he believed the Allen forty would have to pay the Cheeseman mortgage, amounting to $250, as neither deed made any mention of the mortgage.

* * * "An agreement was made whereby Mr. Soule was to receive $100 to look after this matter and have the Allen 40 pay the mortgage. Mr. Soule performed his part of the agreement, in upholding his legal opinion. In the case of *Allen* v. *Soule* (191 Mich. 194) he defended the suit, and made a defense both in the circuit and Supreme Court. This case cost Mr. Soule more than $139 in cash for fees and costs and he received no compensation for services in either court. * * *

"The final item which makes up the amount of the 'Lascobar mortgage of $550' is $60, paid to Charles E. Soule for examining two titles without abstracts, making papers, and getting her the money. The question is not whether this commission is excessive, but is this the amount? Mr. Soule candidly admits that he charged plaintiff a large commission because of the adulterous relations with Mahder, and she had to have the money to get him out of trouble."

The suit of *Allen* v. *Soule,* above referred to (see 191 Mich. 194) arose in this way: In December, 1910, Mr. Soule had given to Mr. Allen a written agreement to discharge the $250 mortgage from the 40-acre parcel, in consideration of the payment of $35 to Mr. Soule, not to be applied on account of the mortgage. It is Mr. Soule's claim, however, that though Mr. Cheeseman paid this $35 to Mr. Allen, the latter never turned it over to Mr. Soule. Later Mr. Allen went to Mr. Soule and offered to purchase the mortgage from him, but Mr. Soule refused to sell it. Mr. Allen then filed a bill, asking for a decree requiring the village lots to be sold first in any fore-

closure proceedings which might be brought. The decree was granted, and was affirmed on appeal.

Relative to the $390 check above referred to, it is plaintiff's claim that she did not receive such a check and cash it on the following day, but that she was paid only $290, and this in currency and at the time of the signing of the papers. She admits that the signature on the back of the check is hers, but says that Mr. Soule must have asked her to place her signature there when she was signing the other papers, without explaining to her what it was.

It is defendant's claim that on June 20, 1911, the Cheeseman note and mortgage were sold and transferred by delivery to one David Alston, who held them until September 24, 1912, when he sold them to the Peoples Savings Bank. That the bank later sold them to a party in Chicago, and that in May, 1917, a Chicago attorney forwarded the papers for the purpose of having the mortgage foreclosed for one Woodhouse, claimed to be the present owner. Upon learning that foreclosure proceedings by advertisement had been commenced, plaintiff filed her bill of complaint in the present proceeding.

The learned chancellor, after hearing the testimony, made the following findings:

"Charles E. Soule claims that the $250 mortgage was not included in the $550 mortgage, but claims that although the plaintiff honestly owed the $250 mortgage and was willing to pay the same, that he, Charles E. Soule, conceived the idea of making an innocent party pay the debt of the plaintiff, that for this advice to the plaintiff he charged her the sum of one hundred dollars and that he also charged her the sum of sixty dollars as a commission for making the loan to her, and that as a balance of the consideration for the $550 mortgage he let the plaintiff have the sum of $390.

"It appears that from the time the $550 mortgage was given, no interest was demanded or paid upon the $250 mortgage, until the present foreclosure proceed-

ings were commenced. Plaintiff paid the interest promptly upon the $550 mortgage, and has paid the principal in full.

"It is clear that the $250 mortgage was included in, and paid by the payment of the $550 mortgage, and that the same having been fully paid should be discharged of record.

"At the time of the making of the $550 mortgage, Charles E. Soule was the agent and attorney of the defendant and had full power and authority to collect and discharge the $250 mortgage, and the same having been fully paid to him, the plaintiff is entitled to a decree discharging the same of record."

From a decree made in accordance therewith, defendant appeals.

KUHN, J. (after stating the facts). This record presents one question for decision, Was the $250 Cheeseman mortgage included in and paid by the $550 mortgage given by the plaintiff to the defendant? This raises simply a question of fact. It is indeed most unfortunate that a controversy such as this, arising between an attorney of long and reputable standing at the bar and his client, finds its way to this court. In the decision of the case, however, as in all others, we must be guided simply by what the record discloses, weigh the testimony with care, and determine whether or not the plaintiff's case has been established. This being a chancery case, the cause is heard here de novo, and it is our duty, as was said in Oliver v. Baldwin, 201 Mich. 360, to exercise independent judgment in passing upon the evidence in this case. We cannot, however, overlook, in determining this question of fact, that the circuit judge who heard the case below, who knew the witnesses, had the opportunity of seeing them on the witness stand, and heard their manner of giving their testimony, had certain advantages which we do not possess in arriving at the truth with reference to the issue involved.

It would not profit any one for us to attempt in this opinion to review the conflicting testimony. It is sufficient to say that after a reading of the entire record and a careful consideration of the claims of counsel with reference to the disputed facts, we are forced to the conclusion that the material question of fact involved upon this record as presented was correctly determined by the trial judge, whose decree, therefore, must be affirmed, with costs to the appellee.

BIRD, C. J., and OSTRANDER, STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred. MOORE, J., did not sit.